# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2022AP140-FT |

COMPLETE TITLE: In the matter of the mental commitment of M.R.M.:

Walworth County,
　　　　　Petitioner-Respondent,
　　　v.
M.R.M.,
　　　　　Respondent-Appellant.

ON CERTIFICATION FROM THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | June 29, 2023 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | February 20, 2023 |

SOURCE OF APPEAL:
　COURT: Circuit
　COUNTY: Walworth
　JUDGE: Kristine E. Drettwan

JUSTICES:
DALLET, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, HAGEDORN, and KAROFSKY, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a concurring opinion. ZIEGLER, C.J., filed a dissenting opinion. ROGGENSACK, J., filed a dissenting opinion.

NOT PARTICIPATING:

ATTORNEYS:

For the respondent-appellant, there were briefs filed by *Megan Sanders-Drazen* and the *Wisconsin Defense Initiative,* Madison. There was an oral argument by *Megan Sanders-Drazen.*

For the petitioner-respondent, there was a brief filed by *Cortney J. Iverson,* assistant corporation counsel. There was an

oral argument by *Cortney J. Iverson,* assistant corporation counsel.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2022AP140
(L.C. No. 2021ME9)

STATE OF WISCONSIN : IN SUPREME COURT

**In the matter of the mental commitment of M.R.M.:**

**FILED**

**Walworth County,**

      **Petitioner-Respondent,**

   **v.**

**M.R.M.,**

      **Respondent-Appellant.**

**JUN 29, 2023**

Samuel A. Christensen
Clerk of Supreme Court

---

DALLET, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, HAGEDORN, and KAROFSKY, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a concurring opinion. ZIEGLER, C.J., filed a dissenting opinion. ROGGENSACK, J., filed a dissenting opinion.

---

APPEAL from an order of the Circuit Court for Walworth County, Kristine E. Drettwan, Judge. *Reversed.*

¶1   REBECCA FRANK DALLET, J.    M.R.M. was involuntarily committed[1] and forcibly medicated for six months following a mental health crisis.   When Walworth County sought to extend M.R.M.'s commitment, he filed a jury demand at least 48 hours prior to his rescheduled final hearing date.   The circuit court denied that jury demand as untimely, held a final hearing, and extended his commitment for 12 additional months.

¶2   We subsequently decided Waukesha County v. E.J.W., 2021 WI 85, 399 Wis. 2d 471, 966 N.W.2d 590, holding that a jury demand is timely if it is filed at least 48 hours before a rescheduled final hearing.   M.R.M. contends that E.J.W. applies retroactively to his case.   He further argues that reversal of the extension order,[2] rather than reversal and remand, is the proper remedy because the circuit court would lack competency on remand.

---

[1] Wisconsin law allows for the involuntary commitment of individuals who are "(1) mentally ill; (2) a proper subject for treatment; and (3) dangerous to themselves or others." Langlade County v. D.J.W., 2020 WI 41, ¶29, 391 Wis. 2d 231, 942 N.W.2d 277; see also generally Wis. Stat. § 51.20 (2021-22). All subsequent references to the Wisconsin Statutes are to the 2021-22 version.

[2] Wis. Stat. § 51.20 and our case law use "extension order" and "recommitment order" interchangeably. Compare Waukesha County v. E.J.W., 2021 WI 85, ¶17, 399 Wis. 2d 471, 966 N.W.2d 590 ("extension orders"), with D.J.W., 391 Wis. 2d 231, ¶44 ("recommitment orders").   We use "extension order" because it is the language included in the statutory provision which governs commitment beyond the initial commitment period. See Wis. Stat. § 51.20(13)(g)3. (referring to the filing of an "application for extension of a commitment").

¶3 We hold that E.J.W. applies retroactively and that the circuit court's denial of M.R.M.'s jury demand was erroneous. We further hold that remand is inappropriate because the circuit court lacks competency on remand when, as in this case, an extension order is reversed on appeal and the preceding commitment order has expired.

I

¶4 M.R.M. was involuntarily committed in Walworth County in January 2021 for a period of six months. In July 2021, the County petitioned the circuit court to extend M.R.M.'s commitment for 12 months. The circuit court adjourned the date originally set for the final hearing so M.R.M. could retain counsel. At least 48 hours before the August 12 rescheduled final hearing, M.R.M. filed a jury demand.

¶5 The circuit court concluded that M.R.M.'s jury demand was untimely based on Marathon County v. R.J.O., 2020 WI App 20, 392 Wis. 2d 157, 943 N.W.2d 898, which held that Wis. Stat. § 51.20(11)(a) "requires a subject individual to request a jury trial at least forty-eight hours before 'the time set for final hearing,' not at least forty-eight hours before the final hearing actually occurs." R.J.O., 392 Wis. 2d 157, ¶41. The circuit court then held a bench trial and extended his commitment for 12 months.

¶6 After the final hearing but before M.R.M. filed this appeal we decided E.J.W., which overruled R.J.O. in part and held that a jury demand is timely if it is filed at least 48

3

hours before a rescheduled final hearing takes place. See E.J.W., 399 Wis. 2d 471, ¶¶38-39, ¶38 n.9. M.R.M.'s jury demand would have been timely if E.J.W. had been decided before his rescheduled final hearing.

¶7 M.R.M. filed an appeal which the court of appeals certified to this court. He raised two issues: (1) whether E.J.W. applies retroactively, and (2) if it does, whether the appropriate remedy for the denial of M.R.M.'s jury demand is reversal or reversal and remand.[3]

## II

¶8 The retroactivity of a prior decision and the appropriate remedy on appeal are both questions of law we review de novo. See Sheboygan County v. M.W., 2022 WI 40, ¶15, 402 Wis. 2d 1, 974 N.W.2d 733; State ex rel. Krieger v. Borgen, 2004 WI App 163, ¶7, 276 Wis. 2d 96, 687 N.W.2d 79.

---

[3] In briefing before both the court of appeals and this court M.R.M. also asserted that the circuit court failed to comply with the requirement in D.J.W. that "circuit courts in [extension] proceedings . . . make specific factual findings with reference to the subdivision paragraph of Wis. Stat. § 51.20(1)(a)2. on which the [extension] is based." 391 Wis. 2d 231, ¶3. When we accept a certification, we "acquire[] jurisdiction over all issues, not merely the issues certified." See Fed. Nat'l Mortg. Ass'n v. Thompson, 2018 WI 57, ¶9 n.4, 381 Wis. 2d 609, 912 N.W.2d 364. We need not address this issue, however, because we reverse the circuit court's extension order on the grounds that it erroneously denied M.R.M.'s jury demand.

III

A

¶9 We first address whether our holding in E.J.W. applies retroactively to M.R.M.'s case.[4] If it does, then the circuit court's denial of M.R.M.'s jury demand was erroneous.

¶10 There is a general presumption that civil decisions apply retroactively. See Wenke v. Gehl Co., 2004 WI 103, ¶69, 274 Wis. 2d 220, 682 N.W.2d 405. The County argues, however, that E.J.W. should not be applied retroactively. We have previously recognized three factors that guide us in deciding whether a civil decision should apply only prospectively. These factors are set forth in Kurtz v. City of Waukesha, 91 Wis. 2d 103, 109, 280 N.W.2d 757 (1979), and adopted from Chevron Oil Co. v. Huson, 404 U.S. 97 (1971).[5] See Trinity Petroleum, Inc. v. Scott Oil Co., 2007 WI 88, ¶76, 302 Wis. 2d 299, 735 N.W.2d 1. They are:

> (1) Does the rule establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed?

---

[4] Neither party asked us to overrule E.J.W.

[5] The United States Supreme Court abandoned the Chevron factors in Harper v. Virginia Department of Taxation, 509 U.S. 86 (1993), which mandated retroactivity in all civil cases. See id. at 90. We have nevertheless continued to apply the Chevron/Kurtz factors. See, e.g., State v. Schulpius, 2006 WI 1, ¶27 n.6, 287 Wis. 2d 44, 707 N.W.2d 495 (declining to overrule Kurtz). Neither party asks us to reconsider Kurtz.

(2) Will retroactive operation further or retard the operation of the new rule?

(3) Will retroactive application produce substantial inequitable results?

Id., ¶77.[6]

¶11 The first factor——whether the decision clearly overruled past precedent——weighs against retroactively applying E.J.W. In R.J.O., the court of appeals held that a jury demand must be made 48 hours before the first time set for a final hearing. See 392 Wis. 2d 157, ¶41. This rule governed ch. 51 cases for 18 months before this court concluded in E.J.W. that a jury demand is timely if it is made at least 48 hours before a rescheduled final hearing. See 399 Wis. 2d 471, ¶3. This represents a clear break with the past precedent governing jury demands.

---

[6] We have not been entirely consistent in how we treat these factors. Some decisions treat them as factors to "weigh" or "consider" while others treat them as a "test" or "threshold," each element of which the party seeking only prospective application of a decision must satisfy. Compare Kurtz v. City of Waukesha, 91 Wis. 2d 103, 109, 280 N.W.2d 757 (1979) ("consideration of the factors"); State ex rel. Brown v. Bradley, 2003 WI 14, ¶15, 259 Wis. 2d 630, 658 N.W.2d 427 (same); Wenke v. Gehl Co., 2004 WI 103, ¶70, 274 Wis. 2d 220, 682 N.W.2d 405 (describing Chevron factors as "bear[ing] on the issue"); with Browne v. WERC, 169 Wis. 2d 79, 112, 485 N.W.2d 376 (1992) ("[A]ll three Chevron factors must be satisfied in order for a decision to apply prospectively."); Trinity Petroleum, Inc. v. Scott Oil Co., 2007 WI 88, ¶77, 302 Wis. 2d 299, 735 N.W.2d 1 ("If these factors are met, the judicial holding in question should not be applied retroactively.").

We need not resolve these inconsistencies because either approach leads to the same conclusion in this case: E.J.W. applies retroactively. Accordingly, we assume for purposes of this discussion that Kurtz sets forth factors to weigh.

¶12 Although the first factor weighs against retroactively applying E.J.W., the second and third factors weigh heavily in favor of retroactivity. The second factor asks if retroactively applying the new rule would further or impede its operation. See Kurtz, 91 Wis. 2d at 109. To answer this question, our cases have looked to, for example, whether retroactive application of the new rule would further "the specific objective embodied in" a statute, and whether meaningful relief could be granted through retroactively applying the new rule. Wenke, 274 Wis. 2d 220, ¶73; see also State ex rel. Buswell v. Tomah Area Sch. Dist., 2007 WI 71, ¶48, 301 Wis. 2d 178, 732 N.W.2d 804.

¶13 Here, there are two reasons why applying E.J.W. retroactively would further——not impede——its operation. First, doing so would give effect to the legislature's policy choices, reflected in ch. 51, "to afford due process protections including jury trials" to all persons subject to commitment. E.J.W., 399 Wis. 2d 471, ¶32. To that end, the legislature adopted Wis. Stat. § 51.20(11)(a), which states that a jury demand is timely so long as it is filed at least 48 hours prior to the time set for the final hearing. See E.J.W., 399 Wis. 2d 471, ¶28. This statute reflects the legislature's "determin[ation] that a minimum of 48 hours' notice is sufficient for the circuit court to secure the presence of jurors and the County to prepare for a jury trial in a mental health commitment case." Id., ¶29. Second, applying E.J.W. retroactively would provide meaningful relief to M.R.M. The

7

circuit court "cannot go back" in time and grant M.R.M. a jury trial after the extension order has expired. See Buswell, 301 Wis. 2d 178, ¶48. Nevertheless, reversing that unlawful extension order will further E.J.W.'s operation by relieving M.R.M. from the order's collateral consequences, such as restrictions on his constitutional right to bear arms and liability for the cost of his care. See Sauk County v. S.A.M., 2022 WI 46, ¶¶19-27, 402 Wis. 2d 379, 975 N.W.2d 162.

¶14 The third factor——whether retroactive application would produce substantial inequities——also weighs in favor of retroactivity. "The equity factor requires us to take into account the desirability of treating similarly situated parties alike." State v. Thiel, 2001 WI App 52, ¶16, 241 Wis. 2d 439, 625 N.W.2d 321. E.J.W. and M.R.M. are similarly situated. Both were denied a jury trial even though their jury demands came at least 48 hours before their rescheduled final hearings. The availability of a jury trial upon timely demand is one of ch. 51's "many provisions designed to offer procedural and substantive protections to the person subject to commitment." E.J.W., 399 Wis. 2d 471, ¶31. And for that reason, it would be inequitable to deprive M.R.M. of his right to a jury trial under the same circumstances that were present in E.J.W. by applying that holding only to future cases.

¶15 In sum, the Chevron/Kurtz analysis does not provide a reason for departing from our presumption of retroactivity in civil cases. Accordingly, we hold that the rule announced in

8

E.J.W. applies retroactively and that M.R.M.'s jury demand was therefore timely.

                                   B

¶16 Having concluded that E.J.W. applies retroactively, we next consider the proper remedy for the circuit court's denial of M.R.M.'s jury demand.  M.R.M. argues that reversal is the appropriate remedy because when the circuit court failed to enter a lawful extension order before the preceding commitment order expired, it lost competency to conduct further proceedings on remand.  Before addressing that argument, we begin with some background on competency.

                                   1

¶17 Article VII, § 8 of the Wisconsin Constitution provides circuit courts with subject-matter jurisdiction in "all matters civil and criminal."  Subject-matter jurisdiction is distinct from a circuit court's competency, which "refers to the court's power to exercise its subject matter jurisdiction in a particular case."  M.W., 402 Wis. 2d 1, ¶35.  Thus, although a circuit court is almost never without subject-matter jurisdiction,[7] it may nonetheless lack competency to exercise

_____

[7] There are exceptions to Mikrut's broad statement that circuit courts always have subject-matter jurisdiction.  See, e.g., State ex rel. CityDeck Landing LLC v. Cir. Ct. for Brown Cnty., 2019 WI 15, ¶32, 385 Wis. 2d 516, 922 N.W.2d 832 (noting the Wisconsin Arbitration Act "comprises one constitutionally-permissible exception to a circuit court's original jurisdiction").

                                   9

that jurisdiction on account of "noncompliance with statutory requirements pertaining to the invocation of that jurisdiction." Village of Trempealeau v. Mikrut, 2004 WI 79, ¶2, 273 Wis. 2d 76, 681 N.W.2d 190.

¶18 Chapter 51 contains numerous such statutory requirements. For example, a circuit court loses competency if it fails to comply with Wis. Stat. § 51.20(7)(a)'s requirement to hold a probable cause hearing "within 72 hours after the individual arrives at the facility." Dodge County v. Ryan E.M., 2002 WI App 71, ¶5, 252 Wis. 2d 490, 642 N.W.2d 592. Similarly, failing to hold a final commitment hearing within 14 days of detention as required by § 51.20(7)(c) results in a loss of competency over an initial commitment proceeding. See State ex rel. Lockman v. Gerhardstein, 107 Wis. 2d 325, 328-29, 320 N.W.2d 27 (Ct. App. 1982).

¶19 The circuit court can also lose competency over extension proceedings. In G.O.T. v. Rock County, 151 Wis. 2d 629, 445 N.W.2d 697 (Ct. App. 1989), the circuit court twice extended an initial commitment order beyond the six-month limit imposed by § 51.20(13)(g). Although G.O.T.'s jury demand "authorized the trial court to temporarily extend the commitment to accommodate that demand," the circuit court lost competency to extend the commitment a second time after the statutory deadline passed. Id. at 633.

¶20 The upshot of these cases is that some of the time limits imposed by ch. 51 are so "'central to the statutory scheme'" that if the circuit court fails to comply with them, it

10

loses competency to proceed in a particular case. Mikrut, 273 Wis. 2d 76, ¶10 (citing State v. Bollig, 222 Wis. 2d 558, 567-68, 587 N.W.2d 908 (Ct. App. 1998)).

2

¶21 To understand M.R.M.'s argument that because the circuit court lacks competency, reversal is the appropriate remedy, it is necessary to distinguish between two important dates. The first important date, August 12, 2021, is the date on which M.R.M.'s initial six-month commitment order expired.[8] The circuit court had competency to extend M.R.M.'s initial commitment only before that date. See G.O.T., 151 Wis. 2d at 633 (explaining that "the trial court must hold the extension hearing before the [prior] commitment expires" because Wis. Stat. § 51.20(13)(g)1. limits initial commitment order to a period "not to exceed 6 months" and extension orders to "a period not to exceed one year."). And the circuit court attempted to do just that. Before M.R.M.'s initial commitment order expired, the circuit court held a final hearing in which it granted a 12-month extension order. The second important date, August 12, 2022, is when that extension order expired.

---

[8] The initial six-month commitment order was set to expire on July 29, 2021. However, the circuit court briefly extended that commitment due to M.R.M.'s request to postpone so he could secure counsel. Accordingly, the circuit court retained competency over the proceedings until August 12, 2021. See G.O.T. v. Rock County, 151 Wis. 2d 629, 633, 445 N.W.2d 697 (Ct. App. 1989).

¶22 In appeals challenging an extension order, it is all but certain that the first date——the expiration of the initial six-month commitment order——will have passed by the time the appeal is resolved. And it is also likely, though less certain, that the second date——the expiration of the challenged extension order——will also have passed. Here, both dates are behind us. For that reason, reversal is the appropriate remedy in this case based on a straightforward application of M.W. That case held that when "the specific [order] at issue"——here, the challenged 12-month extension order——expires while on appeal, reversal is the appropriate remedy because the circuit court lacks competency to conduct further proceedings on remand. M.W., 402 Wis. 2d 1, ¶37.

¶23 M.R.M., however, makes a different argument. Rather than focus on the expiration of the unlawful extension order, he contends that a circuit court loses competency to conduct proceedings on remand when the preceding commitment order expires. In other words, he asks us to conclude that competency on remand is determined from the expiration of the preceding commitment order (the first date in 2021), not the expiration of the unlawful extension order (the second date in 2022). We agree and hold that it is the expiration of the preceding commitment order that determines whether the circuit court has competency on remand.

¶24 As we have explained previously, "[t]he circuit court must hold a hearing on the petition for extension before the previous order expires or it loses competency to extend the

12

commitment." M.W., 402 Wis. 2d 1, ¶36; see also G.O.T., 151 Wis. 2d at 635. And in order to extend someone's commitment at that hearing, the circuit court must "determine[] that the individual is a proper subject for commitment . . . [and] order judgment to that effect." Wis. Stat. § 51.20(13)(g)3. A circuit court that enters an unlawful extension order——by wrongfully denying a timely jury demand, for example——has not complied with these statutory obligations. See G.O.T., 151 Wis. 2d at 632-33. And importantly for competency purposes, once the preceding order expires, it has not complied with these requirements within the statutory time limits for holding a final hearing. See Wis. Stat. § 51.20(13)(g)1. (setting forth the maximum time periods for initial commitments and extension orders). Because those time limits are mandatory and ensure that individuals are in fact "a proper subject for commitment" at the time a commitment or extension order is imposed, they are central to the statutory scheme of ch. 51. See § 51.20(13)(g)3.; see also G.O.T., 151 Wis. 2d at 633; Lockman, 107 Wis. 2d at 330 (explaining that the 14-day deadline for holding a final hearing after an individual is detained is "mandatory and cannot be varied at the discretion of the trial court."). Accordingly, the failure to enter a lawful extension order before the preceding order expires results in a loss of competency. See Shawano County v. S.L.V., No. 2021AP223, unpublished slip op., ¶20 (Wis. Ct. App. Aug. 17, 2021) (reaching the same conclusion). As argued by M.R.M., the expiration of the unlawful extension order——the second date——is

therefore irrelevant because the circuit court lost competency to hold an extension hearing when the preceding commitment order expired. See Eau Claire County v. J.M.P., 2020AP2014-FT, unpublished slip op., ¶21 (Wis. Ct. App. June 22, 2021) (holding that a circuit court's competency is determined by the commitment order preceding the unlawful extension order, not the unlawful extension order itself).

3

¶25 Before closing, we briefly explain why these conclusions are consistent with our decision in Portage County v. J.W.K., 2019 WI 54, 386 Wis. 2d 672, 927 N.W.2d 509. In that case, we rejected the defendant's "domino theory" that reversing an extension order would "necessarily invalidate all later extension[ orders]." J.W.K., 386 Wis. 2d 672, ¶¶15, 21. In doing so, we held that the validity of a previous commitment order has no bearing on the validity of an extension order. See id., ¶21.

¶26 There is an important difference, however, between how we evaluate the validity of a commitment order, as in J.W.K., and how we determine whether a circuit court has competency, as in this case. To assess a commitment order's validity, a reviewing court looks to the sufficiency of the evidence supporting that order. See id. ("[T]he circuit court may order the extension if the County proves its case under the statutory criteria."); see also Wis. Stat. § 51.20(13)(e) ("The petitioner has the burden of proving all required facts by clear and

14

convincing evidence."). The validity of a prior commitment order could never be relevant when determining whether sufficient evidence supports an extension order. See J.W.K., 386 Wis. 2d 672, ¶21. By contrast, the expiration of the immediately preceding commitment order is always relevant when we determine whether a circuit court had competency to grant an extension order. See M.W., 402 Wis. 2d 1, ¶36. As we have explained previously, because the time limit for entering an extension order is central to ch. 51's statutory scheme, the circuit court's competency to enter such an order is contingent on the immediately preceding order not having expired. See id. And when an extension order is reversed on appeal, as is the case here, the circuit court's competency on remand is still tied to the expiration of that immediately preceding commitment order. Because this case and J.W.K. analyze different issues, our holdings are not in tension.[9]

¶27 In sum, the circuit court may issue an extension order only before the preceding commitment order expires. See M.W.,

---

[9] Justice Roggensack's dissent misunderstands the distinction between the validity of an extension order and the circuit court's competency to conduct proceedings on remand. Despite the dissent's claims to the contrary, nothing in this decision affects the validity of any commitment order M.R.M. may be subject to currently.

Moreover, our conclusion that the circuit court lost competency to conduct further proceedings on remand when it failed to enter a lawful extension order before the preceding commitment order expired does not mean that the circuit court would necessarily lack competency to extend any commitment order that M.R.M. may be subject to currently or to consider a new petition for commitment.

15

402 Wis. 2d 1, ¶36. If that extension order is reversed on appeal, the circuit court's competency to conduct proceedings on remand depends on whether the preceding commitment order has expired.[10] See G.O.T., 151 Wis. 2d at 632-33. In this case, because the circuit court denied M.R.M.'s timely jury demand, its extension order is unlawful. And because the preceding commitment order has expired, the circuit court lacks competency to conduct proceedings on remand. Therefore, reversal is the appropriate remedy.

*By the Court.*—The decision of the circuit court is reversed.

---

[10] While this case involves an initial six-month commitment order and a 12-month extension order, the same logic applies to cases involving consecutive 12-month extension orders. When an extension order is reversed on appeal, a circuit court's competency on remand depends on whether the preceding commitment order has expired.

16

¶28  REBECCA GRASSL BRADLEY, J.   *(concurring).*

[T]he common law . . . stands or falls with the admission of legal principles obtained not by command, but by retrospective estimates of right and justice.

Paul Vinogradoff, Common-Sense in Law 207 (1913).

¶29  The majority reaches the correct outcome; however, its analysis is incompatible with "[t]he true traditional view" that "courts have no authority to engage" in "prospective decisionmaking[.]" Harper v. Va. Dep't of Tax'n, 509 U.S. 86, 106 (1993) (Scalia, J., concurring). Among other errors, the majority conflates this court's judicial power with legislative power. Unlike the legislature, the judiciary generally has only the power to "expound" on existing law——not the authority to "pronounce . . . new law[.]" Intro., William Blackstone, Commentaries *69. "[A] judicial . . . act" is "a determination of what the existing law is in relation to some existing thing already done," while "a legislative act" is "a predetermination of what the law shall be for the regulation of all future cases." Harper, 509 U.S. at 107 (quoting Thomas Cooley, Constitutional Limitations *91). An overruled decision loses not only its future application but any retroactive effect as well; once the court corrects its error of interpretation, the decision is for all purposes erased:

> The theory is, not that . . . [an] overruled decision made law, which is changed by . . . [a] later decision, but that the earlier decision, being a mistake, never was the law, but that the law is and always has been as expounded in the later decision. This . . . is not at all like changing the existing body of law by the repeal of a statute; it is more like "removing a cloud" from the law. It does not regard the prior decision as law, though bad law,

1

which must be altered, but as mere color of law without any substance. Hence the overruling of a decision relates back to the date of the overruled decision, operating retrospectively, upon all transactions which can be reached by it, and the prior decision stands as though it had never been made.

Henry Campbell Black, Handbook on the Law of Judicial Precedents or the Science of Case Law 689-90 (1912).

¶30 In derogation of this longstanding principle, the freewheeling test adopted in Kurtz v. City of Waukesha, which the majority employs in this case, offends the separation of powers by dislodging the legislature from its lawmaking function whenever the court decides to craft a more "just" result than the law would otherwise produce. 91 Wis. 2d 103, 280 N.W.2d 757 (1979). This court has a duty to overrule Kurtz, which was premised on a United States Supreme Court decision from which the Court retreated 30 years ago. Id. at 109 (quoting Chevron Oil v. Huson, 404 U.S. 97 (1971), limited by Harper, 509 U.S. at 89 (majority op.)). For decades, this court has employed decision-avoidance mechanisms to preserve Kurtz, contravening its duty to act within the limited scope of power the people vested in the judiciary. Because the court continues to cling to lawmaking power the people never gave it, I do not join the majority opinion but respectfully concur.

¶31 Retroactive application of precedent is a deeply-rooted traditional rule in common law jurisprudence.[1] One United States Supreme Court justice "was prepared to hazard the guess

[1] The traditional rule has "a few exceptions," "collateral review and vested rights," which are not at issue in this case. Bryan A. Garner et al., The Law of Judicial Precedent 308 (2016).

2

that '[j]udicial decisions have had retrospective operation for near a thousand years.'" Harper, 509 U.S. at 106 (Scalia, J., concurring) (quoting Kuhn v. Fairmont Coal Co., 215 U.S. 349, 372 (1910) (Holmes, J., dissenting)). "For most of our history, the [United States] Supreme Court followed the common-law tradition and the Founders' guidance, largely keeping to 'a general rule of retrospective effect[.]'" Bryan A. Garner et al., The Law of Judicial Precedent 310 (2016) (quoting Robinson v. Neil, 409 U.S. 505, 507 (1973)). Currently, the Court follows the traditional rule, as do "[m]ost states[.]" Id. at 313. Wisconsin is an exception.

¶32 In the twentieth century, the United States Supreme Court briefly abandoned the traditional rule, only to return to it near the end of that century. As relevant to this case, the United States Supreme Court wrote the following in Chevron Oil v. Huson, a 1971 decision:

> In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that 'we must * * * weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' Finally, we have weighed the inequity imposed by retroactive application, for '(w)here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity.'

3

404 U.S. at 106-07 (citations omitted) (modifications in the original).

¶33 Two serious deficiencies plague this "new approach." Garner et al., The Law of Judicial Precedent, at 311. Fundamentally, it created "serious constitutional problems[.]" Id. In the words of Justice Antonin Scalia, "'the province and duty of the judicial department [is] to say what the law is,' not what the law shall be." Harper, 509 U.S. at 107 (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803)). Judges interpret law; they do not make it. To apply precedent only prospectively suggests the court's decision changed the law, which cannot be. See Griffith v. Kentucky, 479 U.S. 314, 323 (1987) ("In truth, the Court's assertion of power to disregard current law in adjudicating cases before us that have not already run the full course of appellate review, is quite simply an assertion that our constitutional function is not one of adjudication but in effect of legislation.") (quoting Mackey v. United States, 410 U.S. 667, 679 (1971) (Harlan, J., concurring in the judgment))). "Even when a 'former determination is most evidently contrary to reason . . . [or] contrary to the divine law,' a judge overruling that decision would 'not pretend to make a new law, but to vindicate the old one from misrepresentation.'" Harper, 404 U.S. at 107 (quoting Intro., Blackstone, Commentaries *70).

¶34 "Nonretroactivity also raised obvious equal-protection concerns by treating similarly situated . . . [parties] differently: often the Court would apply a new rule only to

4

the . . . [party] lucky enough to have appealed his case to the Court at just the right moment." Garner et al., The Law of Judicial Precedent, at 311. As the United States Supreme Court later explained, "it is the nature of judicial review that precludes us from '[s]imply fishing one case from the stream of appellate review, using it as a vehicle for pronouncing new . . . standards, and then permitting a stream of similar cases subsequently to flow by unaffected by that new rule.'" Griffith, 479 U.S. at 323 (quoting Mackey, 401 U.S. at 679).

¶35 Relatedly, "Chevron Oil created confusion and inconsistent results[.]" Garner et al., The Law of Judicial Precedent, at 312. As an amorphous judicial invention, the Chevron Oil test, unsurprisingly, can be applied to reach whatever result the judge favors. Such inconsistent application also amplifies equal-protection concerns.

¶36 In 1993, the United States Supreme Court all but abandoned Chevron Oil. In Harper v. Virginia Department of Taxation, the Court explained:

> When this Court does not "reserve the question whether its holding should be applied to the parties before it," . . . an opinion announcing a rule of federal law "is properly understood to have followed the normal rule of retroactive application" and must be "read to hold . . . that its rule should apply retroactively to the litigants then before the Court."

509 U.S. at 97-98 (majority op.) (quoting James B. Beam Co. v. Georgia, 501 U.S. 529, 539 (1991) (lead op.)) (second ellipsis in the original). As interpreted and applied federally, "Harper means that new rules of civil cases are now almost always applied retroactively" absent an express reservation in the case

5

announcing the rule. Garner et al., The Law of Judicial Precedent, at 312; see also Green v. Humama at Home, Inc., unpublished slip. op, No. 16-cv-7586 (AJN), 2017 WL 9916832 *8-9 (S.D.N.Y. Sept. 29, 2017) ("[U]nless a court explicitly reserves the question of retroactivity, its decision 'is properly understood to have followed the normal rule of retroactive application.' Humana has not presented a compelling reason why this [c]ourt should consider the Chevron Oil factors. As explained above, there is nothing in Weil II to suggest that the D.C. Circuit expressly reserved on the question of retroactivity. As a result, under Harper, the Chevron Oil factors are inapplicable." (quoting Harper, 509 U.S. at 97-98)).

¶37 Fourteen years before Harper, this court applied Chevron Oil in Kurtz. Kurtz, 91 Wis. 2d at 108-09. In that case, however, this court applied Chevron Oil to determine whether a recent United States Supreme Court decision had retroactive effect. Id. On questions of federal law, this court follows federal precedent. Johnson v. Wis. Elections Comm'n, 2021 WI 87, ¶21, 399 Wis. 2d 623, 967 N.W.2d 469. As evidenced by the majority opinion in this case, Kurtz has been carelessly extended to govern the retroactivity of Wisconsin precedent as well. Despite Harper's course correction 30 years ago, this court continues to apply Kurtz.

¶38 This court has avoided addressing the soundness of Kurtz for decades, typically invoking the party presentation principle. See State ex rel. Brown v. Bradley, 2003 WI 14, ¶41,

6

259 Wis. 2d 630, 658 N.W.2d 427 (Sykes, J., dissenting) ("As the majority notes, although the State mentioned Harper in its brief, it declined to take a position on whether we ought to enunciate a uniform standard of retroactivity . . . ; Brown did not even cite Harper. While it is clear that Chevron Oil is no longer good law and Kurtz should therefore be revisited, I agree that the question is better left for another case[.]" (Citation omitted)); State ex rel. Giffin v. Smith, 2004 WI 36, ¶65, 270 Wis. 2d 235, 677 N.W.2d 259 (Sykes, J., concurring) ("Here, as in Brown, the parties did not brief the issue of Wisconsin's continued reliance on Chevron Oil in light of Harper. For that reason, . . . we need not address here whether to conform our law to Harper.").

¶39 Even when the issue has been raised, however, this court has avoided it. The majority in this case attempts to justify applying the Kurtz test by relying on State v. Schulpius, 2006 WI 1, ¶27 n.6, 287 Wis. 2d 44, 707 N.W.2d 495. In that case, this court determined the retroactivity question was irrelevant because the respondent had forfeited a key objection. Id., ¶27. Nevertheless, this court commented on the retroactivity issue in a footnote. In full, the footnote states:

> Schulpius urges this court to overrule its decision in Kurtz v. City of Waukesha, 91 Wis. 2d 103, 280 N.W.2d 757 (1979), and adopt the rule of Harper v. Virginia Department of Taxation, 509 U.S. 86, 113 S. Ct. 2510, 125 L.Ed.2d 74 (1993) on the retroactive application of a new rule of law. We decline to do so here. However, even if this court were to adopt the rule of Harper on retroactivity, we do not believe it

7

would impact on this case. <u>Harper</u> held that when the United States Supreme Court:

> applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule.
>
> <u>Id.</u> at 97, 113 S. Ct. 2510. Because Schulpius failed to appeal the November, 2000 order within 90 days of entry of the order, as per Wis. Stat. § 808.04(1), Schulpius's case was not open on direct review at the time of this court's decision in <u>Morford</u>.

<u>Id.</u>, ¶27 n.6. This conclusory footnote, which offers no reasoning and largely reads like dicta ("even if this court were to adopt the rule of <u>Harper</u> on retroactivity, we do not believe it would impact on this case") is inconsistent with this court's law-declaring function. <u>See</u> <u>State ex rel. Wis. Senate v. Thompson</u>, 144 Wis. 2d 429, 436, 424 N.W.2d 385 (1988) ("[I]t is this court's function to develop and clarify the law."). This court is not supposed to ignore "major questions of substantive law" by employing "superficial" reasoning. Citizens Study Comm. on Jud. Org., <u>Report to Governor Patrick J. Lucey</u> 78 (1973) (on file at the David T. Prosser Jr. State Law Library). Had this court in <u>Schulpius</u> analyzed whether <u>Kurtz</u> should be overruled, perhaps <u>Schulpius</u> would have present utility, but in the absence of such an analysis, <u>Schulpius</u> has none. <u>See also</u> <u>Wenke v. Gehl Co.</u>, 2004 WI 103, ¶75 n.43, 274 Wis. 2d 220, 682 N.W.2d 405 ("Even if we followed the <u>Harper</u> approach, we would nonetheless apply this ruling retroactively, as <u>Harper</u> disavows any

8

exceptions to the rule of retroactive application in the civil context.").

¶40 Sometimes decision avoidance is appropriate; however, when an issue concerns the parameters of judicial power, the court should decide it. Because Kurtz is objectively wrong, this court has a duty to overrule it. State v. Johnson, 2023 WI 39, ¶49, 407 Wis. 2d 195, 990 N.W.2d 174 (Rebecca Grassl Bradley, J., concurring) (citing Friends of Frame Park, U.A. v. City of Waukesha, 2022 WI 57, ¶42, 403 Wis. 2d 1, 976 N.W.2d 405 (Rebecca Grassl Bradley, J., concurring)). Kurtz poses an especially grave threat to the rule of law because this court appropriated power in the absence of authority. Specifically, it equated law with precedent interpreting law, blurring the fundamental distinction between the legislative and judicial domains. Cf. id., ¶76 ("The judiciary takes an oath to uphold the United States Constitution, not precedent. . . . Our oath obligates us to overturn 'judge-made constitutional law,' when 'divorced' from the United States Constitution." (Quoting Lino A. Graglia, Constitutional Law Without the Constitution: The Supreme Court's Remaking of America, in "A Country I Do Not Recognize": The Legal Assault on American Values 1-2 (Robert H. Bork ed., 2005))). It would be "crazy not to worry that if judges consider themselves free to disregard the Constitution's separation of powers they might soon find other bothersome parts of the Constitution equally unworthy of their fidelity." Neil M. Gorsuch, Of Lions and Bears, Judges and Legislators, and the

9

Legacy of Justice Scalia, 66 Case W. Res. L. Rev. 905, 911 (2016).

¶41 The United States Supreme Court's decision in Harper illuminates another aspect of this court's error in Kurtz. Precedent may be overturned when "[c]hanges or developments in the law have undermined the rationale behind a decision." State v. Roberson, 2019 WI 102, ¶50, 389 Wis. 2d 190, 935 N.W.2d 813 (quoting Bartholomew v. Wis. Patients Comp. Fund & Compcare Health Servs. Ins., 2006 WI 91, ¶33, 293 Wis. 2d 38, 717 N.W.2d 216). Chevron Oil spawned Kurtz, but Harper deflated Chevron Oil, thereby undermining the foundation of this court's reasoning in Kurtz. See Friends of Frame Park, 403 Wis. 2d 1, ¶89 (explaining a similar series of events undermined the rationale behind several court of appeals decisions).

¶42 Kurtz also borders on "unworkable," providing yet another reason to overrule it. See Roberson, 389 Wis. 2d 190, ¶50 (quoting Bartholomew, 293 Wis. 2d 38, ¶33). The erosion of the traditional rule of retroactivity "generated . . . many incompatible rules and inconsistent principles." Desist v. United States, 394 U.S. 244, 258 (1969) (Harlan, J., dissenting). The majority cannot even explain what the actual Kurtz test is——despite Kurtz being 44 years old. The majority admits:

> We have not been entirely consistent in how we treat these factors. Some decisions treat them as factors to "weigh" or "consider" while others treat them as a "test" or "threshold," each element of which the party seeking only prospective application of a decision must satisfy. Compare Kurtz v. City of Waukesha, 91 Wis. 2d 103, 109, 280 N.W.2d 757 (1979)

10

("consideration of the factors"); State ex rel. Brown v. Bradley, 2003 WI 14, ¶15, 259 Wis. 2d 630, 658 N.W.2d 427 (same); Wenke v. Gehl Co., 2004 WI 103, ¶70, 274 Wis. 2d 220, 682 N.W.2d 405 (describing Chevron factors as "bear[ing] on the issue"); with Browne v. WERC, 169 Wis. 2d 79, 112, 485 N.W.2d 376 (1992) ("[A]ll three Chevron factors must be satisfied in order for a decision to apply prospectively."); Trinity Petroleum, Inc. v. Scott Oil Co., 2007 WI 88, ¶77, 302 Wis. 2d 299, 735 N.W.2d 1 ("If these factors are met, the judicial holding in question should not be applied retroactively.").

We need not resolve these inconsistencies because either approach leads to the same conclusion in this case: E.J.W. applies retroactively. Accordingly, we assume for purposes of this discussion that Kurtz sets forth factors to weigh.

Majority op., ¶10 n.6. If the rule of law is to be more than the rule of judges, the vagueness and subjectivity inherent in Kurtz cannot stand.

¶43 For all of these reasons, this court should overrule Kurtz and restore the traditional rule of retroactivity that previously prevailed for a millennium. Its application in this case is straightforward. In Waukesha County v. E.J.W., this court interpreted Wis. Stat. § 51.20(11)(a) (2019-20). 2021 WI 85, 399 Wis. 2d 471, 966 N.W.2d 590. In doing so, it partially overruled a court of appeals decision, Marathon County v. R.J.O., 2020 WI App 20, 392 Wis. 2d 157, 943 N.W.2d 898. This court in E.J.W. did not——indeed, could not——alter the fixed meaning of § 51.20(11)(a). R.J.O. was not "the law" but "the opinion" of judges who (as the majority saw it) "mist[ook] the law." Blackstone, Commentaries, *71. Because this court in E.J.W. did not reserve the retroactivity issue, E.J.W. applies retroactively——even though lower courts in this state were

11

required to follow the incorrect interpretation in R.J.O. until this court overturned it.

¶44 The majority could have simply applied the traditional rule of retroactivity in a few short paragraphs, but instead preserves a faulty test the United States Supreme Court deserted three decades ago. Although "liberty can have nothing to fear from the judiciary alone" it has "every thing to fear from its union with either of the other departments[.]" The Federalist No. 78 (Alexander Hamilton). "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, selfappointed, or elective, may justly be pronounced the very definition of tyranny." The Federalist No. 47 (James Madison). The majority perpetuates the augmentation of judicial power with the legislative power through unquestioned, dogmatic adherence to now-defunct precedent. In doing so, the majority disfigures the structural separation of powers and treads a path to tyranny the constitution does not abide. I do not join it.

12

¶45 ANNETTE KINGSLAND ZIEGLER, C.J. *(dissenting).* I dissent because M.R.M.'s recommitment contains no legal error. Almost two years ago in Waukesha County v. E.J.W., 2021 WI 85, 399 Wis. 2d 471, 966 N.W.2d 590, a majority of this court erroneously interpreted the unambiguous command under Wis. Stat. § 51.20(11)(a) that "[a] jury trial is deemed waived unless demanded at least 48 hours in advance of the time set for final hearing." The E.J.W. majority held "that when a final hearing is rescheduled, § 51.20(11)(a) allows a jury demand to be filed up until 48 hours prior to a rescheduled final hearing." Id., ¶3. The majority's conclusions today only serve to highlight E.J.W.'s error. E.J.W. was wrong when it was decided, it remains wrong today, and the majority's failure to overrule E.J.W. sends our interpretation of § 51.20(11)(a) further out to sea. Instead of ruling E.J.W. applies retroactively, I would overrule E.J.W. and conclude M.R.M. waived his right to a jury trial at his recommitment hearing.

¶46 I also conclude that the circuit court did not run afoul of our decision in Langlade County v. D.J.W., 2020 WI 41, 391 Wis. 2d 231, 942 N.W.2d 277, where we instructed circuit courts in ch. 51 recommitment proceedings "to make specific factual findings with reference to the subdivision paragraph of Wis. Stat. § 51.20(1)(a)2. on which the recommitment is based." Id., ¶3. The circuit court thoroughly explained its factual findings. It is clear the court concluded there was a substantial likelihood that, if M.R.M. was not recommitted, M.R.M.'s impaired judgment would again make him a danger to

1

himself or others and a proper subject for commitment under Wis. Stat. § 51.20(1)(a)2.c. The circuit court therefore complied with our instruction in D.J.W. M.R.M.'s argument to the contrary amounts to a complaint that the circuit court did not use "magic words" by specifically citing or quoting § 51.20(1)(a)2.c. Even if the circuit court's explanation did not comport with D.J.W., that error would be harmless because we have no trouble discerning the basis for M.R.M.'s recommitment. Accordingly, M.R.M.'s recommitment contained no error, and that recommitment should be affirmed.

I

¶47 Our state constitution provides, "The right of trial by jury shall remain inviolate, and shall extend to all cases at law without regard to the amount in controversy; but a jury trial may be waived by the parties in all cases in the manner prescribed by law." Wis. Const. art. I, § 5 (emphasis added). As is true in other civil cases, juries in ch. 51 commitment proceedings are waived absent a jury demand. Sheboygan County v. M.W., 2022 WI 40, ¶52, 402 Wis. 2d 1, 974 N.W.2d 733 (Ziegler, C.J., dissenting) (explaining that ch. 51 proceedings are civil cases and, "absent a jury demand," factual findings are left to the circuit court). In accord with our constitution, Wis. Stat. § 51.20(11)(a) prescribes the manner in which a jury is waived in ch. 51 proceedings: "A jury trial is deemed waived unless demanded at least 48 hours in advance of the time set for final hearing, if notice of that time has been

2

previously provided to the subject individual or his or her counsel."

¶48 The statutory text is plain. Under Wis. Stat. § 51.20(11)(a), the circuit court sets the time for the final hearing. The commitment subject must submit a jury demand "at least 48 hours in advance" of that time. Id. If the subject does not do so, then "[a] jury trial is deemed waived." Id. Here, the circuit court set the time of M.R.M.'s final hearing for July 28, 2021. He was informed:

> If you want a jury trial, it must be demanded or requested at least 48 hours in advance of the trial date. In the event the request is not made within 48 hours in advance of the trial date, you automatically, under the statutes, waive your right to a jury trial.

M.R.M. failed to demand a jury trial at least 48 hours in advance of his trial date. Therefore, at that time, M.R.M. was deemed to have waived his right to a jury trial. Even though the court rescheduled his final hearing, M.R.M. could not later demand a jury trial because he already waived that right. The waiver occurred 48 hours before the time set for final hearing, "not . . . forty-eight hours before the final hearing actually occurs." Marathon County v. R.J.O., 2020 WI App 20, ¶41, 392 Wis. 2d 157, 943 N.W.2d 898, overruled by E.J.W., 399 Wis. 2d 471. M.R.M. waived a jury trial in the manner prescribed by law, and the law provides no mechanism for him to claw back that waiver.

¶49 However, "[t]he majority in [E.J.W.] replaced [this] clear jury waiver standard in chapter 51 commitment proceedings with a shifting and unpredictable rule" which "depart[ed] from

3

sound judicial administration [and] is not supported by the plain text." E.J.W., 399 Wis. 2d 471, ¶41 (Ziegler, C.J., dissenting). Since the day E.J.W. was decided, it has been "detrimental to coherence and consistency in the law" and "unsound in principle." Johnson Controls, Inc. v. Emps. Ins. of Wausau, 2003 WI 108, ¶¶98-99, 264 Wis. 2d 60, 665 N.W.2d 257.

¶50 The majority in E.J.W. fundamentally misunderstood the concept of waiver. Wisconsin Stat. § 51.20(11)(a) defines the point in time at which waiver occurs.

> Thus, the only question under []§ 51.20(11)(a) . . . is procedural: at what time and date was [the] deadline to submit a jury demand or have it deemed waived? Section 51.20(11)(a) provides a straightforward and rational answer: "[A]t least 48 hours in advance of the time set for final hearing."

E.J.W., 399 Wis. 2d 471, ¶47 (Ziegler, C.J., dissenting). Once that waiver occurs, the "jury right [is] permanently waived." Id., ¶54 (Ziegler, C.J., dissenting). "'[W]aiver,' under the plain language of Wis. Stat. § 51.20(11)(a), is not conditional or subject to revocation. It is a final extinguishment of a right." Id., ¶59 (Ziegler, C.J., dissenting). "A waiver when once made cannot be recalled, revived, expunged, or revoked, nor can the right waived be reclaimed . . . ." 31 C.J.S. Estoppel and Waiver § 93 (2023). Once a jury trial is deemed waived under § 51.20(11)(a), that waiver is effective going forward. This is true regardless of whether the circuit court reschedules the final hearing. The right to a jury trial has been waived, and nothing has restored it.

4

¶51 By concluding "that when a final hearing is rescheduled, [Wis. Stat.] § 51.20(11)(a) allows a jury demand to be filed up until 48 hours prior to a rescheduled final hearing," the majority in E.J.W. altered the statutory text. 399 Wis. 2d 471, ¶3. It effectively inserted a provision permitting a right once waived to be restored. E.J.W. thus amended the "the manner prescribed by law" for waiving a jury trial in ch. 51 proceedings. Wis. Const. art. I, § 5. E.J.W. also undermined consistency in the law, creating a special rule for jury trial waivers in ch. 51 proceedings as opposed to waivers that take place in any other context. The majority's interpretation in E.J.W. contravened both the statutory text and the law generally.

¶52 The majority's opinion in this case only serves to highlight E.J.W.'s errors and the consequences of those errors. In concluding E.J.W. should be afforded retroactive application, the majority in part relies on "the legislature's policy choices," among those the apparent choice "to afford due process protections" in ch. 51 civil commitment proceedings. Majority op., ¶13 (quoting E.J.W., 399 Wis. 2d 471, ¶28). The majority's invocation of due process principles, both here and in E.J.W., further inches judicial interpretation of Wis. Stat. § 51.20(11)(a) away from the statutory text. It puts a due process gloss on a statutory provision, which "ha[s] no relevance to the issues in this case." E.J.W., 399 Wis. 2d 471, ¶45 (Ziegler, C.J., dissenting). Section 51.20(11)(a) is not a bulwark protecting the right to a jury trial in ch. 51 civil

5

commitment proceedings. It is simply "the manner prescribed by law" by which "a jury trial may be waived." Wis. Const. art. I, § 5. The majority's analysis infers a far greater purpose than the text fairly implies, building upon the errors that began with E.J.W.

¶53 Giving E.J.W. retroactive effect rather than overruling it will also throw circuit court dockets into chaos. In an equally flawed decision, a majority of this court created a bright-line rule that recommitment orders are never moot. Sauk County v. S.A.M., 2022 WI 46, ¶3, 402 Wis. 2d 379, 975 N.W.2d 162. It did so based on "[a] theoretical and unproven collateral consequence" of recommitment, which "has never been a standalone reason to conclude that a case is not moot." Id., ¶40 (Ziegler, C.J., concurring in part, dissenting in part). By giving E.J.W. retroactive effect, the majority opens the floodgates, inviting innumerable challenges to recommitment orders that have long since expired.

¶54 "Precedents should be respected, but sometimes the [c]ourt errs, and occasionally the [c]ourt issues an important decision that is egregiously wrong. When that happens, stare decisis is not a straitjacket." Dobbs v. Jackson Women's Health Org., 597 U.S. ___, 142 S. Ct. 2228, 2280 (2022). Here, the majority "do[es] more damage to the rule of law by obstinately refusing to admit [its] errors, thereby perpetuating injustice, than by overturning [this] erroneous decision." Johnson Controls, Inc., 264 Wis. 2d 60, ¶100. I would correct this

6

mistake by overruling E.J.W., and therefore conclude that M.R.M.'s recommitment did not violate Wis. Stat. § 51.20(11)(a).

II

¶55 M.R.M. also argues his recommitment was unlawful because the circuit court's explanation of its decision did not follow D.J.W., 391 Wis. 2d 231. In D.J.W., we instructed "that going forward circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of Wis. Stat. § 51.20(1)(a)2. on which the recommitment is based." Id., ¶3. M.R.M. argues "the circuit court ran afoul of D.J.W. by failing to set forth either the requisite findings of fact or the dangerousness standard it deemed proven."

¶56 "For a person to be subject to a chapter 51 involuntary commitment, three elements must be fulfilled: the subject individual must be (1) mentally ill; (2) a proper subject for treatment; and (3) dangerous to themselves or others." Id., ¶29 (citing Wis. Stat. § 51.20(1)(a)1.-2.). In an initial commitment, the county must provide evidence of the potential commitment subject's current dangerousness under one of five subdivision paragraphs in ch. 51:

> a. Evidences a substantial probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm.
>
> b. Evidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt

7

act, attempt or threat to do serious physical harm. . . .

      c. Evidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself or other individuals. . . .

      d. Evidences behavior manifested by recent acts or omissions that, due to mental illness, he or she is unable to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue unless the individual receives prompt and adequate treatment for this mental illness. . . .

      e. For an individual, other than an individual who is alleged to be drug dependent or developmentally disabled, after the advantages and disadvantages of and alternatives to accepting a particular medication or treatment have been explained to him or her and because of mental illness, evidences either incapability of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives, or substantial incapability of applying an understanding of the advantages, disadvantages, and alternatives to his or her mental illness in order to make an informed choice as to whether to accept or refuse medication or treatment; and evidences a substantial probability, as demonstrated by both the individual's treatment history and his or her recent acts or omissions, that the individual needs care or treatment to prevent further disability or deterioration and a substantial probability that he or she will, if left untreated, lack services necessary for his or her health or safety and suffer severe mental, emotional, or physical harm that will result in the loss of the individual's ability to function independently in the community or the loss of cognitive or volitional control over his or her thoughts or actions. . . .

§ 51.20(1)(a)2.

¶57 In a recommitment hearing, current dangerousness may be proved by demonstrating the treatment following the initial

8

commitment "ameliorated [the dangerous] behavior, but if treatment were withdrawn, there may be a substantial likelihood such behavior would recur." Portage County v. J.W.K., 2019 WI 54, ¶19, 386 Wis. 2d 672, 927 N.W.2d 509.

> If the individual has been the subject of inpatient treatment for mental illness, developmental disability, or drug dependency immediately prior to commencement of the proceedings as a result of a voluntary admission, a commitment or protective placement ordered by a court under this section . . . , the requirements of a recent overt act, attempt or threat to act under par. (a)2. a. or b., pattern of recent acts or omissions under par. (a)2. c. or e., or recent behavior under par. (a)2. d. may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn. . . .

Wis. Stat. § 51.20(1)(am).

¶58 The issue in D.J.W. was whether "the evidence introduced at the recommitment hearing was insufficient to support a conclusion that D.J.W. is 'dangerous' pursuant to either §§ 51.20(1)(a)2.c. or 2.d. and 51.20(1)(am)." 391 Wis. 2d 231, ¶3. Resolving this issue proved difficult because "[i]t was not clear at either the initial commitment hearing or the extension hearing on which subdivision paragraph of Wis. Stat. § 51.20(1)(a)2. the commitment was based." Id., ¶36. To avoid future difficulties of this sort, "we determine[d] that going forward circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of § 51.20(1)(a)2. on which the recommitment is based." Id., ¶40. The purpose of this requirement is to

9

provide notice of the statutory basis for recommitment to both the subject and reviewing courts. Id., ¶¶42-44 ("[I]t provides clarity and extra protection to patients regarding the underlying basis for a recommitment" and "will clarify issues raised on appeal of recommitment orders and ensure the soundness of judicial decision making.").

¶59 However, our decision in D.J.W. did not create a "magic words" requirement. "The court in D.J.W. did not hold that a circuit court's failure to cite a statutory reference is enough to overturn a valid mental health commitment." M.W., 402 Wis. 2d 1, ¶45 (Ziegler, C.J., dissenting).[1] It merely "reiterated the long-established principle that circuit courts must explain their reasoning and legal conclusions when they decide civil cases." Id., ¶64 (Ziegler, C.J., dissenting). "Nowhere in D.J.W. did we state that appellate courts would reverse any and all recommitment orders that, on a cursory review, lack citation to an initial commitment pathway." Id., ¶55 (Ziegler, C.J., dissenting). Furthermore, ch. 51 compels that a reviewing court undertake a harmless error review even if it finds the circuit court failed to adequately explain the facts and law. Under Wis. Stat. § 51.20(10)(c), "The court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings that does not affect the substantial rights of either party." D.J.W.'s instruction to

---

[1] The majority in M.W. did not disagree with my analysis of D.J.W. It failed to reach the D.J.W. issue in that case, just as the majority does here.

circuit courts in no way absolves us of our statutory obligation to apply harmless error review in ch. 51 proceedings.

¶60 The circuit court in this case did not run afoul of D.J.W. The record sufficiently demonstrates that the circuit court made factual findings supporting a determination of dangerousness under Wis. Stat. § 51.20(1)(a)2.c. using the alternative evidentiary method in § 51.20(1)(am). In other words, the record demonstrates that the circuit court found "a substantial likelihood, based on [M.R.M.'s] treatment record, that" "there [would be] a substantial probability of physical impairment or injury to himself . . . or others" "if treatment were withdrawn" due to M.R.M.'s "impaired judgment."

¶61 The circuit court relied heavily on the testimony of a psychiatrist who examined M.R.M. The psychiatrist also submitted to the circuit court a 14-page written report detailing M.R.M.'s treatment history, the psychiatrist's account of interviewing M.R.M., an examination of M.R.M.'s mental status, psychiatric diagnosis, and opinions regarding civil commitment. His report discussed the January 2021 incident prompting M.R.M.'s initial commitment: M.R.M. "walking around his property with a loaded gun making suicidal and homicidal remarks" and, "[u]pon arrival at the ER, . . . yell[ing] that he was going to take everybody out." The psychiatrist's report concluded M.R.M. "suffers from Schizoaffective Disorder" and that M.R.M.'s condition "only improved as a result of subsequent involuntary psychotropic treatment." The psychiatrist also stated in his report that he was "concerned about the current

11

plan to reduce medication dosages until symptoms of psychosis re-emerge" and opined that "commitment extension is warranted in order to allow staff to intervene when [M.R.M.] becomes symptomatic again, given that he already has no insight into his mental illness, treatment needs and concerns about prior dangerousness while less actively symptomatic." His report further concluded,

> [T]here is a substantial likelihood that he would become a proper subject for commitment if treatment were withdrawn. At the current time, his risk of harm to himself and others through judgment impaired by paranoid psychosis, leading him recklessly brandishing a weapon in public amid suicidal and homicidal threats has been mitigated by the oversight of medication compliance under the conditions of civil commitment.

¶62 At the recommitment hearing, the psychiatrist testified in a manner consistent with his report. He stated M.R.M. "suffers from schizoaffective disorder[, which] is a treatable mental illness." He also testified M.R.M. "has told every one along the way that he does not believe that he suffers from a mental illness or need[s] treatment when all evidence suggests otherwise." Based on his review of clinical records and independent examiner reports discussing M.R.M.'s treatment history, the psychiatrist testified, "I believe it is a substantial likelihood that [M.R.M.] would exhibit or experience the same type of symptoms he exhibited back in January with the associated dangerousness if treatment were withdrawn," which he described as "judgment impaired by paranoid psychosis."

¶63 Based on the psychiatrist's testimony and report, the circuit court "found his opinions and his insight to be

12

credible, to be thoughtful." The court "f[ou]nd by clear and convincing evidence, here, [M.R.M.] does have a mental illness whether he wishes to admit it or not. At least five psychiatrists believe that he does . . . ." It "agree[d] that [M.R.M.] is a proper subject for treatment. He has been responding to the medication or medications that he's been receiving . . . since the incident in January." The court remarked that "[w]hat happened in January was incredibly serious, incredibly frightening, incredibly dangerous not only to [M.R.M.], but to other people, too." The court further explained, "[I]f you choose not to believe you have the mental illness or don't want to take the medications, the person you're potentially hurting[,] and there's clear and convicting evidence of that, is not only yourself, but it's others, too." The court told M.R.M.,

> I think that if you are not under the commitment that you will not take your medication; you will not avail yourself of the other treatments in addition to medication and we will be right back where we were in January and maybe this time somebody really will be hurt.

The court found, "because of [M.R.M.'s] poor insight into his having this illness and needing treatment . . . and attempts to manipulate care providers . . . I'm concerned at the forcefulness of which he wants to have a weapon back in his hands." It therefore concluded there was "a substantial likelihood that [M.R.M.] would again become a proper subject for treatment relatively quickly and would again be dangerous."

13

¶64 M.R.M. complains that, based on the circuit court's findings, he "is left to guess what specific threat the circuit court believed he posed" under Wis. Stat. § 51.20(1)(a)2. This is simply not true. The circuit court repeatedly voiced its concern that something similar to the January 2021 incident where M.R.M. brandished a gun could occur if he was not recommitted. This was based on both the January 2021 incident and M.R.M.'s conduct during treatment denying the existence of his condition. Additionally, the psychiatrist's report and testimony both referenced M.R.M.'s "impaired judgment." Based on the circuit court's findings, it takes little effort to understand the circuit court found M.R.M. would pose "a substantial probability of physical impairment or injury to himself . . . or other individuals" due to his "impaired judgment" under § 51.20(1)(a)2.c. The circuit court relied on M.R.M.'s treatment record and the psychiatrist's conclusions from that record, which showed that M.R.M. had "judgment impaired by paranoid psychosis." The court believed this affliction could recur, and M.R.M. "would be a proper subject for commitment if treatment were withdrawn." § 51.20(1)(am). M.R.M.'s quarrel therefore appears to be with the circuit court's failure to use "magic words" by either quoting or citing the applicable subdivision paragraph. D.J.W. does not require this. Even if it did, we must disregard such an error as harmless under Wis. Stat. § 51.20(10)(c) because the statutory basis for M.R.M.'s recommitment is easily discerned from the record.

14

III

¶65 M.R.M.'s recommitment is devoid of legal error. Instead of ruling E.J.W. applies retroactively, I would overrule E.J.W. and conclude M.R.M. waived his right to a jury trial at his recommitment hearing. E.J.W. was wrong when it was decided, it remains wrong today, and the majority's failure to overrule E.J.W. sends our interpretation of Wis. Stat. § 51.20(11)(a) further out to sea. The majority's conclusions today only serve to highlight E.J.W.'s error, and we should take this opportunity to overrule it.

¶66 I also conclude that the circuit court did not run afoul of our decision in D.J.W. The circuit court thoroughly explained its factual findings. It is clear the court concluded there was a substantial likelihood that, if M.R.M. was not recommitted, M.R.M.'s impaired judgment would again make him a danger to himself or others and a proper subject for commitment under Wis. Stat. § 51.20(1)(a)2.c. The circuit court therefore complied with our instruction in D.J.W. M.R.M.'s argument to the contrary amounts to a complaint that the circuit court did not use "magic words" by specifically citing or quoting § 51.20(1)(a)2.c. Even if the circuit court's explanation did not comport with D.J.W., that error would be harmless because we have no trouble discerning the basis for M.R.M.'s recommitment. Accordingly, M.R.M.'s recommitment contained no error, and that recommitment should be affirmed.

¶67 For the foregoing reasons, I respectfully dissent.

15

¶68 PATIENCE DRAKE ROGGENSACK, J. *(dissenting)*. The majority opinion concludes that because a commitment extension order was entered in error due to denial of a jury request that was deemed untimely, the circuit court lost competency to proceed further in regard to the effect of M.R.M.'s mental illness on the State's ability to bring him to trial.[1] In so concluding, the majority opinion directly conflicts with our decision in Portage Cnty. v. J.W.K., 2019 WI 54, ¶21, 386 Wis. 2d 672, 927 N.W.2d 509, with regard to circuit court competency for orders issued subsequent to a defective order. The majority opinion's holding on competency is totally unnecessary to resolving the jury request issue for which we granted review and it also has the potential to terminate the treatment that M.R.M. likely is receiving today based on an order that would have had to be entered before expiration of the extension order that we review today.[2]

---

[1] Majority op., ¶3. The majority opinion concludes that a commitment extension order for M.R.M. entered August 13, 2021 is invalid because M.R.M.'s request for a jury trial was not honored based on a decision from this court that occurred after the circuit court addressed M.R.M.'s jury trial request. To clarify, the circuit court correctly applied Marathon Cnty v. R.J.O., 2020 WI App 20, 392 Wis. 2d 157, 943 N.W.2d 898, to M.R.M.'s jury trial request, which was the controlling law at the time of the circuit court's decision. I choose not to address that portion of the majority opinion that deals with retroactivity.

[2] The majority opinion ignores that this dissent is grounded in the findings of four psychiatrists who have personally examined M.R.M. and have found that he is dangerous due to a substantial probability of physical harm to himself. While most people with mental illness are not a danger to themselves or others, the record before us conclusively shows that M.R.M. needs medical care because of the substantial probability that

1

¶69 As I explain below with my review of the record before us, the majority opinion is wrong under our precedent and it puts M.R.M. at significant risk of inflicting self-harm and/or harm to others because the majority opinion makes necessary medical care more difficult to receive. Accordingly, I respectfully dissent.

## I. BACKGROUND

¶70 In January of 2021, M.R.M. came to the attention of law enforcement because he was carrying a loaded gun and making suicidal and homicidal statements. He is reported to have been "screaming" and "stated several times he was going to kill people and then himself and at one point said he is Jesus Christ."[3] The gun M.R.M. was waving while he screamed was a "loaded glock 27 (.40 cal[iber]) pistol, [that had] a round in the chamber" and seven rounds in the magazine.[4]

¶71 M.R.M. is reported to have told the admitting nurse at Aurora Lakeland Emergency Room that "the numbers told him everyone had to die, and he had to kill himself as well. [He] stated he has been diagnosed with schizophrenia and bipolar disorder and would then laugh and say, 'No, I am not.'"[5]

---

he will inflict physical harm on himself.

[3] R. 1: Statement of Emergency Detention by Law Enforcement Officer.

[4] Id.

[5] R. 1: Village of Genoa City Police Department Incident Report (emphasis added).

2

¶72 He was transported to Winnebago Mental Health Institute (WMHI) and was examined initially by three psychiatrists.[6] At the Probable Cause Hearing, Dr. Pjerla testified:

> A [M.R.M.] was admitted to Winnebago on an emergency detention. So I was to evaluate and assess whether he required further hospitalization.
>
> Q And what day did the examination occur on?
>
> A The 20th.
>
> . . . .
>
> Q Doctor, can you estimate how much total time you spent with [M.R.M.]?
>
> A In person over the last two days, maybe 45 minutes. And then reviewing records, talking and obtaining collateral information, discussing things with the team, another 45 minutes to an hour.
>
> Q And, Doctor, what records or collateral information have you been able to review?
>
> A I was able to review the information from the crisis report, the emergency detention, the emergency room documentation, some collateral information from [the] patient's mother as well.
>
> . . . .
>
> Q After your examination of [M.R.M.], do you have an opinion as to whether he has a mental illness?
>
> A Yes.
>
> Q And what is your opinion?
>
> A I believe he does.
>
> . . . .

---

[6] Dr. Srananthi Pjerla, Dr. Marshall Bales and Dr. Leslie Taylor are licensed psychiatrists.

Q  Do you have an opinion as to whether [M.R.M.] is a proper subject for treatment of his mental illness?

A  I believe he is.

. . . .

Q  And, Doctor, do you have an opinion as to whether [M.R.M.] is a danger to himself or to others?

A  Yes, I believe he is.

Q  And what is the nature of risk that you believe?

A  So I believe that he was dangerous to himself when he pointed a gun at his head and was threatening to kill himself.  Now, [M.R.M.] has said that he was not intending to do this, but that he was just pretending in order to scare his mother.  [M.R.M.] has said that he did not believe that the gun was loaded.  But on review of some of the information, it does appear that the gun was loaded.  So I believe that [M.R.M.'s] thought process and confusion about reality contributed to those behaviors and the suicide gesture or attempt.  He also made threats to kill other people.[7]

¶73 During Dr. Bales's exam, [M.R.M.] repeated he was Jesus Christ and that "everyone had to die."[8]  Since admission to WMHI, M.R.M. admitted "he was intent on killing himself but that his mother talked him out of it.  He was distinctly manic, hyperverbal, labile, dysphoric, agitated, and defensive, stating he did not have a mental health problem."[9]  Dr. Bales found that

---

[7] R. 79 at 6-10:  Dr. Pjerla's testimony at probable cause hearing.

[8] R. 21:  Report of Examination (by Dr. Bales, M.D.).

[9] Id.

4

M.R.M. is dangerous because there is a "substantial probability of physical harm to himself."[10]

¶74 Dr. Bales also said:

[M.R.M.] is a 43-year-old Caucasian male who suffers from a substantial disorder of thought, mood, or perception. He has been dangerous in ways noted. His condition is treatable, and he is a proper subject for treatment. Based on the above, it is my opinion with a reasonable degree of medical certainty that he does meet the criteria for a six-month Chapter 51 commitment with an order to treat. The least restrictive environment is inpatient on a locked psychiatric unit. At the discretion of his inpatient treating physician, he can transition to outpatient care when stable. He will benefit from psychotherapy, case management, psychiatric care, and other services.[11]

¶75 Another psychiatrist, Dr. Taylor, also examined M.R.M., his intake records, talked with his mother and with his brother-in-law. She confirmed that M.R.M. is dangerous due to a "substantial probability of physical harm to himself . . . [and] [a] substantial probability of physical harm to other subjects as manifested by evidence of recent homicidal or other violent behavior."[12] Based on the above history, M.R.M. was committed for six months in January 2021.

¶76 In July 2021, Walworth County petitioned to extend M.R.M.'s commitment, with an adjourned recommitment hearing scheduled for August 12, 2021. Dr. Robert Rawski testified about his examination of M.R.M.[13] He said that he spent about an

_____

[10] Id.

[11] Id.

[12] R. 23: Report of Examination (by Dr. Taylor).

[13] R. 66: Dr. Rawski is a licensed psychiatrist.

hour and 45 minutes talking to M.R.M. and he spent about three hours reviewing his records and constructing a report. His testimony included the following:

> Q. [W]hat is your opinion and what is his diagnosis?
>
> A. I believe to a reasonable degree of medical certainty that [M.R.M.] suffers from schizoaffective disorder. That is a treatable mental illness. It features a substantial disorder of thought, mood and perception that grossly impairs his judgment, behavior, capacity to recognize reality and the ability to meet the ordinary demands of life.
>
> . . . .
>
> Q. Do you have an opinion whether based on [M.R.M.]'s treatment record that he would be a proper subject for commitment if treatment were withdrawn?
>
> A. Yes. I believe it is a substantial likelihood that he would exhibit or experience the same type of symptoms he exhibited back in January with the associated dangerousness if treatment were withdrawn. . . . The likelihood of that is significant given his poor insight into his mental illness and need for treatment.[14]

¶77 After that hearing, M.R.M. again was found to have a mental illness that was a proper subject for treatment, and that he met the statutory standards for dangerousness. The circuit court signed and entered a commitment extension on August 13, 2021 for 12 months "from the expiration date of the prior commitment order."[15] The "prior commitment order" to which reference was made is the original commitment that expired August 12, 2021. Therefore, the extension order that is subject to these proceedings expired by its terms on August 11, 2022.

---

[14] R. 66 at 11-14.

[15] R. 53: Order of Extension of Commitment.

6

¶78 Given that M.R.M. has a mental illness that causes him to be a danger to himself and to others, it is likely another commitment extension was processed on or before August 11, 2022, such that M.R.M. currently is receiving treatment for his illness. Because health care records are confidential, we do not know the current status of his treatment today, but the record informs us that four licensed psychiatrists have concluded that he is dangerous to himself and to others.

## II. DISCUSSION

¶79 The majority opinion concludes that the circuit court's denial of a jury trial in regard to the one year extension order that began in August 2021 and expired in August 2022 was a "failure to enter a lawful extension order before the preceding order expires," and results in the circuit court losing competency to conduct further proceedings. It cites an unpublished court of appeals decision to support its conclusion.[16]

¶80 In briefing, M.R.M. addressed the relevance of competency very differently from the position of the majority opinion herein. In his briefing, M.R.M. explained "it's whether a reviewing court that deems an unexpired commitment order unlawful should reverse it outright or also remand the case for a new trial. . . . [However, the] circuit court cannot hold a new trial on an old commitment petition, as it will invariably

---

[16] Majority op., ¶24, citing Shawano Cnty. v. S.L.V., No. 2021AP223, unpublished slip op., ¶20 (Wis. Ct. App. Aug. 17, 2021).

lose competency before remand [to hold a new trial]."[17] The majority opinion's conclusion that the circuit court loses competency to conduct further proceedings presents an unlimited loss of competency, far beyond M.R.M.'s position that competency to hold a new trial within the time frame of the extension order likely would be lacking.

¶81 The majority also concludes that the date the one year extension order expired is "irrelevant because the circuit court lost competency to hold an extension hearing when the preceding commitment order expired." The majority opinion again cites an unpublished court of appeals decision to support its assertion.[18]

¶82 What is unstated, but held nonetheless by the majority opinion, is that once an order is determined to be unlawful any orders that are connected to that order are also invalid because the circuit court had no competency to issue valid subsequent orders. This creates the same "domino theory" that we held in J.W.K. "[was] not supported by the text of the statute." J.W.K., 386 Wis. 2d 672, ¶21.

¶83 To explain further, in J.W.K. we held: "Reversing the expired 2016 order for insufficient evidence would have no effect on subsequent recommitment orders because later orders stand on their own under the language of the statute." Id., ¶1 (emphasis added). J.W.K. had argued, similar to what the

---

[17] M.R.M. brief, p. 13.

[18] Majority op., ¶24 (citing Eau Claire Cnty. v. J.M.P., 2020AP2014-FT, unpublished slip op., ¶21 (Wis. Ct. App. June 22, 2021).

majority holds today, that "reversal of the 2016 order would mean the circuit court lacked competency to issue the 2017 extension order." Id., ¶15.

¶84 The majority opinion says, "There is an important difference, however, between how we evaluate the validity of a commitment order, as in J.W.K., and how we determine whether a circuit court has competency, as in this case."[19] That may be true, but prior to this matter, circuit courts did not lose competency to issue orders prior to the preceding order's expiration date even if an order was later declared unlawful.

¶85 Here, the extension order was held unlawful because a jury trial was denied and a loss of competency followed.[20] In J.W.K., "An appellate court's later conclusion that the evidence was insufficient to support the August 2016 extension order would not retroactively change the fact that at the time the circuit court entered the extension order in July 2017, the prior order had not expired; therefore, the circuit court retained competency to enter the unchallenged July 2017 order." Id., ¶22.

¶86 We explained in J.W.K. Wis. Stat. § 51.20(13)(g)1. contemplates "consecutive orders of commitment," and as long as "the extension is made prior to the expiration of the previous commitment order, the circuit court may order the extension if

---

[19] Majority op., ¶26.

[20] "Accordingly, the failure to enter a lawful extension order before the preceding order expires results in a loss of competency." Id., ¶24.

the County proves its case under the statutory criteria." Id., ¶21.[21] We also concluded that "reversing the [earlier] commitment order does not retroactively deprive the circuit court that issued a subsequent commitment order of competency." Id. Our holding rejected the concurrence/dissent's position in J.W.K..[22]

¶87 It is the same "loss of competency" contention that we rejected from the dissent in J.W.K. that the majority opinion articulates in the case now before us: "[B]ecause the circuit court denied M.R.M.'s timely jury demand, its extension order is unlawful. And because the preceding commitment order has expired, the circuit court lacks competency to conduct proceedings on remand."[23]

¶88 The majority opinion cites G.O.T. v. Rock Cnty., 151 Wis. 2d 629, 445 N.W.2d 697 (Ct. App. 1989) to support its

---

[21] The concurrence/dissent in Portage Cnty. v. J.W.K., 2019 WI 54, ¶36, 386 Wis. 2d 672, 927 N.W.2d 509, (Dallet, J., concurring/dissenting), also argued that if an extension order was invalid the "chain of commitment was broken" and the county had to begin the commitment process as though there had been no prior finding of incompetence.

[22] In J.W.K. we rejected the same competency argument the majority holds in favor of today:

> If current dangerousness was not established at the August 2016 extension hearing, the August 2016 extension was invalid. As such, the initial commitment order would have expired prior to it being extended and the circuit court would have lacked competency to enter any subsequent extension orders.

Id., ¶34 (Dallet, J., concurring/dissenting) (emphasis added).

[23] Majority op., ¶27.

global, prospective loss of competency.[24] In G.O.T., the circuit court repeatedly extended a commitment beyond the amount of time that Wis. Stat. § 51.20(13)(g) permitted, and the court of appeals concluded that the circuit court did not have competency to ignore a statutory directive. Id. at 633. G.O.T. reviewed a past court act. It did not establish a prospective loss of competency for "any subsequent extension orders," as the majority opinion has done.

¶89 There are real-life dangers in setting up a "domino effect" whenever the circuit court makes an error that causes the overturning of all subsequent orders. One is that a majority opinion of this court takes away the only means the State has to protect a repeatedly dangerous person from harm to himself and/or to others.

¶90 The extension order under review here, by its terms, expired in August of 2022. It is likely that an extension of treatment was ordered then. If so, subsequent treatment would be on-going now; however, the majority opinion has the potential to terminate it with its conclusion that the circuit court lacked competency to issue subsequent extension orders.

### III. CONCLUSION

¶91 The record before us clearly shows that four psychiatrists have concluded that M.R.M. is dangerous because he is substantially likely to cause physical harm to himself and/or others. Concluding that circuit courts lack competency to provide needed care for an individual that is dangerous to

---

[24] Id., ¶19.

11

himself and others is unsupported in the law and irresponsible. Accordingly, I respectfully dissent.