COURT OF APPEALS
DECISION
DATED AND FILED

September 14, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP961**

Cir. Ct. No. **2008ME67**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

IN THE MATTER OF THE MENTAL COMMITMENT OF J. D. C.:

WAUPACA COUNTY,

PETITIONER-RESPONDENT,

V.

J. D. C.,

RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Waupaca County: VICKI L. CLUSSMAN, Judge. *Reversed*.

¶1 NASHOLD, J.[1] J.D.C. appeals an order extending his involuntary commitment under WIS. STAT. ch. 51 and an associated order making him subject

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

to involuntary medication and treatment. J.D.C. argues that these orders must be reversed because the circuit court did not make the factual findings required by our supreme court in *Langlade County v. D.J.W.*, 2020 WI 41, 391 Wis. 2d 231, 942 N.W.2d 277. J.D.C. also argues that the County presented insufficient evidence to show: that he was dangerous, that he was a proper subject for treatment, or that involuntary medication is warranted. I conclude that the circuit court failed to make the factual findings required by *D.J.W.* Accordingly, I reverse both the recommitment order and the associated order for involuntary medication.

## BACKGROUND

¶2    J.D.C. has been under continuous WIS. STAT. ch. 51 commitment in Waupaca County since 2008. It is undisputed for purposes of this appeal that J.D.C. is mentally ill and has a schizoaffective disorder.

¶3    In August 2022, the County commenced proceedings to extend J.D.C.'s commitment. To prevail in a WIS. STAT. ch. 51 recommitment[2] proceeding, a county must prove, by clear and convincing evidence, that the subject individual is: (1) mentally ill; (2) a proper subject for treatment; and (3) dangerous under one of five statutory dangerousness standards set forth in WIS. STAT. § 51.20(1)(a)2.a.-e. *Portage County v. J.W.K.*, 2019 WI 54, ¶18, 386 Wis. 2d 672, 927 N.W.2d 509; § 51.20(1)(a), (13)(e).

---

[2] WISCONSIN STAT. § 51.20, as well as courts discussing that statute, use the terms "recommitment" and "extension of a commitment" interchangeably. *See Portage County v. J.W.K.*, 2019 WI 54, ¶18, 386 Wis. 2d 672, 927 N.W.2d 509.

¶4 At the hearing held in this matter, the County introduced the testimony of psychiatrist Dr. Marshall Bales, as well as the testimony of J.D.C.'s case manager Cary Ogden. Ogden testified that since J.D.C.'s initial 2008 commitment, J.D.C. had generally "resided in group home settings," although he had been "in and out of unsuccessful community placements." Ogden testified that, at the time of the hearing, J.D.C. was residing in a locked inpatient facility, and that this heightened level of restriction was related to an incident involving "an assault of a staff member" that occurred in 2019.[3]

¶5 Ogden testified that J.D.C. has behavioral issues that "if allowed to escalate" sometimes reach a point where he "bangs his head against the wall," "stamps his feet," "walks around with clenched fists," and "badger[s]" staff members. Ogden testified to a recent incident where J.D.C. stated that "if his needs were not met immediately, he would require seclusion." Because "[s]eclusion is a response from the behavioral plan to address physical violence," Ogden interpreted J.D.C.'s statement as a threat that J.D.C. would become physically violent.

¶6 Psychiatrist Bales testified that he met with J.D.C. and observed that J.D.C. "was irritable, labile, hyperverbal," and "simply failed to take responsibility for his behavior." Bales opined that if J.D.C. were no longer subject to a commitment order, J.D.C. would "stop medications," "consume alcohol," and "have police contacts." Bales noted a 2019 incident in which J.D.C. attempted

---

[3] It appears that Ogden misspoke, because records from earlier proceedings in this case show that this incident actually occurred in October 2020.

suicide by "ingestion of some kind of a lime out substance," resulting in hospitalization.

¶7     Bales testified that he believed J.D.C.'s schizoaffective disorder is treatable with "sobriety, medication compliance, and very important things like keeping appointments, working with anger management classes and such." Bales testified that J.D.C. had shown some improvement, but that J.D.C. would need to "succeed outside of a locked inpatient unit" before J.D.C. would be an appropriate candidate for receiving treatment on a voluntary, rather than involuntary, basis. According to Bales, J.D.C. had recently been in a less restrictive group home setting, but this placement did not go well, and J.D.C. was returned to his previous locked inpatient facility.

¶8     The circuit court determined that, although there was testimony that J.D.C. was "improving," the County had established grounds for the extension of J.D.C.'s commitment and for an involuntary medication and treatment order. As to dangerousness, the court stated that "[b]ased on Dr. Bales' testimony, as well as Mr. Ogden's, … there is a substantial probability of physical harm to others, as manifested or shown by a substantial likelihood, based on his treatment records, …. [t]hat he would be a proper subject for commitment if treatment were withdrawn."

¶9     After the circuit court's oral ruling, the County noted that the dangerousness standard that the court had identified in its ruling (based on probability of harm to others) was not the dangerousness standard the County had identified in its proposed written order (which was a different standard based on probability of self-harm). The court indicated that "there was testimony to that effect," so it would "amend the proposed order to include the substantial

probability of harm to himself." The court did not make any other statements at the hearing as to the basis for its determination that J.D.C. was dangerous.

¶10 Following the hearing, the circuit court issued a written order. Consistent with its oral ruling, the court checked boxes indicating that two dangerousness standards had been met: "substantial probability of physical harm to himself or herself," and "substantial probability of physical harm to other individuals." *See* WIS. STAT. § 51.20(1)(a)2.a., b. The court also checked a box indicating that these dangerousness standards have been shown by "a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." *See* § 51.20(1)(am). Additionally, the court checked a box indicating that these dangerousness standards had been shown by "a recent overt act, attempt or threat to act," *see* § 51.20(1)(a)2.a.-e., although the court's oral ruling did not articulate any specific recent acts showing dangerousness. The court extended J.D.C.'s commitment for twelve months, ending on September 19, 2023.[4]

---

[4] This opinion is issued nearly a year after the circuit court's recommitment order, close to the expiration of that order. However, the delay has been at the request of J.D.C.'s counsel. J.D.C. has been represented by the state public defender's office, which has requested numerous extensions throughout the appellate process. After filing a notice of intent to pursue post-disposition relief on September 23, 2022, J.D.C.'s counsel requested and was granted an extension of time to appoint appellate counsel. After appellate counsel was appointed, that attorney moved to withdraw, and no replacement was appointed until March 23, 2023. The deadline to file a notice of appeal was extended to May 30, 2023, at the request of J.D.C.'s new counsel. Thus, no notice of appeal was filed until over eight months after the challenged recommitment order. J.D.C.'s counsel then sought an extension of time to file an appellant's brief. Accordingly, due to the multiple delays requested by J.D.C.'s counsel, the close of briefing in this appeal did not occur until September 8, 2023, less than two weeks before the expiration of the challenged recommitment order.

**DISCUSSION**

¶11     J.D.C. argues that the order extending his commitment must be reversed because the circuit court violated our supreme court's directive in **D.J.W.**, requiring circuit courts in recommitment proceedings to make "specific factual findings with reference to" a statutory dangerousness standard. **D.J.W.**, 391 Wis. 2d 231, ¶40. J.D.C. also argues that the recommitment order must be reversed because the County did not introduce sufficient evidence to show that he was dangerous or that he was a proper subject for treatment. Finally, J.D.C. argues that the involuntary medication order must be reversed because the County failed to introduce sufficient evidence to support that order. I do not address J.D.C.'s challenges to the sufficiency of the evidence because I conclude that the circuit court failed to comply with **D.J.W.** and that the proper remedy is reversal of both the recommitment order and the involuntary medication and treatment order.[5]

I.  **D.J.W.** Directive

¶12     To prevail in a WIS. STAT. ch. 51 recommitment proceeding, a county must prove, among other things, that the subject individual is dangerous under one of the statutory standards set forth in WIS. STAT. § 51.20(1)(a)2.a.-e. **J.W.K.**, 386 Wis. 2d 672, ¶18; § 51.20(1)(a). These standards include (among others) "substantial probability of physical harm to him or herself" under § 51.20(1)(a)2.a., and "substantial probability of physical harm to other individuals" under § 51.20(1)(a)2.b. Regardless of which dangerousness standard

---

[5] *See* **Turner v. Taylor**, 2003 WI App 256, ¶1 n.1, 268 Wis. 2d 628, 673 N.W.2d 716 (this court need not address all issues if one issue raised by the parties is dispositive).

applies, the circuit court in a recommitment proceeding must "make specific factual findings with reference to the [dangerousness] subdivision paragraph of § 51.20(1)(a)2. on which the recommitment is based." *D.J.W.*, 391 Wis. 2d 231, ¶40. For ease of reference, I sometimes refer to these requirements set forth in *D.J.W.* as "the *D.J.W.* directive."

¶13 This appeal presents a question about the scope of the *D.J.W.* directive. J.D.C. contends that the circuit court failed to comply with the *D.J.W.* directive because the court's ruling is devoid of specific factual findings. In response, the County contends that the court complied with the *D.J.W.* directive, and appears to argue that the only "findings" required by *D.J.W.* are recitations of the applicable statutory dangerousness standards that have been met.[6]

¶14 As stated, the *D.J.W.* directive requires the circuit court in a recommitment proceeding to "make specific factual findings with reference to the subdivision paragraph of [WIS. STAT.] § 51.20(1)(a)2. on which the recommitment is based." *Id.* On its face, the *D.J.W.* directive appears to have two components: a requirement of "specific factual findings," and a requirement that those specific factual findings "reference" the applicable statutory dangerousness standard.

---

[6] Although not cited by the parties, a review of unpublished, one-judge opinions from this court applying *Langlade County v. D.J.W.*, 2020 WI 41, 391 Wis. 2d 231, 942 N.W.2d 277, reveals differing conclusions as to whether *D.J.W.* requires specific evidentiary findings, or just identification of the applicable statutory dangerousness standard. For example, in *Ozaukee County v. J.D.A.*, No. 2021AP1148, unpublished slip op. (WI App Dec. 15, 2021), we concluded that the circuit court violated the *D.J.W.* directive when it "recited some of the language of the applicable subdivision paragraph on which it relied," but "did not make any specific findings as to how the evidence presented at the hearing fit into the statute." *Id.*, ¶¶18-19. By contrast, in *Barron County v. K.L.*, No. 2022AP502, unpublished slip op. (WI App Feb. 7, 2023), we concluded that the circuit court did not violate the *D.J.W.* directive when it indicated the applicable dangerousness standards by checking boxes on a form order, but did not make explicit evidentiary findings. *Id.*, ¶¶12, 22.

Notably, this directive cannot mean that the court must make a "finding" of dangerousness under the specific statutory dangerousness standard, because the "determination of dangerousness is not a factual determination, but a legal one based on underlying facts." *See id.*, ¶47. Thus, the "specific factual findings" contemplated by *D.J.W.* must mean findings more specific than the court's ultimate legal conclusion of dangerousness, suggesting that *D.J.W.* requires specific evidentiary findings of fact that refer to the applicable dangerousness standard.

¶15 This reading also comports with a concurring opinion by Justice Hagedorn in *Sheboygan County v. M.W.*, 2022 WI 40, 402 Wis. 2d 1, 974 N.W.2d 733, that further discusses the *D.J.W.* directive. The concurrence explains that the *D.J.W.* directive has two distinct requirements: a requirement to make "specific factual findings" and a requirement to "state which dangerousness standard the recommitment is based on":

> [A] circuit court can fall short of our *D.J.W.* directive by failing to make specific factual findings or by failing to state which dangerousness standard the recommitment is based on.
>
> … A circuit court might, for example, neglect to explicitly reference the standard of dangerousness on which the recommitment is based …. Alternatively, *D.J.W.*'s instructions could be violated by failing to make specific factual findings on a small or large scale….

*M.W.*, 402 Wis. 2d 1, ¶¶41-42 (Hagedorn, J., concurring).

¶16 This concurrence further supports the conclusion that the "specific factual findings" required by *D.J.W.* are more than mere recitations of the elements of the statutory dangerousness standard. By reciting the statutory language, the circuit court does little if anything more than "state which

dangerousness standard the recommitment is based on," which is a separate requirement. The "specific factual findings" requirement must therefore entail something more. Further, the concurrence's statement that the "specific factual findings" requirement can be violated on a "small or large scale" suggests that the court is required to make findings that significantly engage with the evidentiary record.

¶17 Additionally, the stated purposes underlying the **D.J.W.** directive suggest that the directive is meant to require specific findings of evidentiary fact. The **D.J.W.** court explained that the purpose of its directive is "twofold." **D.J.W.**, 391 Wis. 2d 231, ¶42. First, the directive is meant to benefit patients by providing "clarity and extra protection to patients regarding the underlying basis for a recommitment." **Id.** Because involuntary commitments implicate fundamental liberty interests, "the accompanying protections should mirror the serious nature of the proceeding" and "ensure that recommitments are based on sufficient evidence." **Id.**, ¶43. Second, **D.J.W.**'s directive is meant to benefit the courts by ensuring "soundness of judicial decision making" and presenting appellate courts with a "more substantial record" that will "better equip appellate courts to do their job." **Id.**, ¶44.

¶18 Requiring circuit courts to make specific findings of evidentiary fact serves these stated purposes. **D.J.W.**'s directive is meant to ensure "soundness of judicial decision making," particularly in regards to ensuring that the commitment is "based on sufficient evidence." In light of the paramount liberty interests at stake in an involuntary commitment, it is reasonable to read **D.J.W.**'s directive as requiring circuit courts to engage with the evidence by making specific findings of evidentiary fact, helping ensure that these proceedings reflect their "serious nature."

¶19 As to facilitating appellate review, the **D.J.W.** court's reference to creating a "more substantial record" appears to mean creating a record of the circuit court's evidentiary findings and reasoning. Such a record would indeed "better equip appellate courts to do their job." Notably, if the circuit court does not make specific evidentiary findings, the appellate court is forced to review the entire record in a challenge to the sufficiency of the evidence of dangerousness de novo, without the benefit of the circuit court's impressions of the evidentiary record.[7] And where (as here), the circuit court determines that multiple dangerousness standards have been met, this lack of factual specificity makes appellate proceedings especially difficult, because litigants must present arguments on (and appellate courts must evaluate) each of these multiple evidentiary paths to dangerousness in a sufficiency challenge, all without the benefit of any specific findings pertaining to this evidence. Further, in cases where sufficiency challenges are accompanied by arguments that the circuit court erroneously admitted certain evidence, it is crucial for the appellate court to be able to determine whether the circuit court relied on the challenged evidence.

¶20 For the above reasons, I conclude that the **D.J.W.** directive requires specific findings of evidentiary fact supporting dangerousness. Thus, identifying the applicable statutory dangerousness standard does not, by itself, satisfy the **D.J.W.** directive.

---

[7] As previously noted, the ultimate "determination of dangerousness is not a factual determination, but a legal one based on underlying facts" and is reviewed de novo. **D.J.W.**, 391 Wis. 2d 231, ¶47. By contrast, any factual findings underpinning a determination of dangerousness are reviewed by appellate courts under the erroneous exercise of discretion standard. **Id.** Thus, in the absence of specific factual findings by the circuit court, the appellate court must review the entire record de novo in a challenge to the sufficiency of the evidence.

¶21 I now consider whether the circuit court's ruling complied with this requirement. On this record, I need not consider the extent to which specific evidentiary findings are required because the circuit court did not make any evidentiary findings. The court did not engage with the evidentiary record beyond stating that: there was testimony that J.D.C. was "improving" (which does not support a conclusion of dangerousness), its ruling was "based on the testimony of Dr. Bales and Mr. Ogden," and there was "testimony to [the] effect" that J.D.C. was a danger to himself. Although the court indicated that J.D.C. was dangerous due to a "substantial probability of physical harm" both to himself and to others, these determinations are not the specific evidentiary findings required by *D.J.W.* Instead, they simply specify the applicable dangerousness standards, and as previously discussed, *D.J.W.* requires more.

¶22 The circuit court's ruling exemplifies why the *D.J.W.* directive is necessary. The court's cursory ruling does little to demonstrate that J.D.C.'s involuntary commitment was the result of a reasoned consideration of the evidence. *See id.*, ¶42. Further, the court's ruling does little to facilitate appellate review. *See id.* This is particularly true because the court indicated that multiple dangerousness standards had been met, without any findings as to how the evidence met these standards. As J.D.C. notes, because the court's ruling provides "no clarity about the basis" for its determinations, the parties are left to "scour the record to address the sufficiency of the evidence" on appeal, in essence, forcing the appellate court to act as fact-finder. *See Sands v. Menard, Inc.*, 2013 WI App 47, ¶32 n.14, 347 Wis. 2d 446, 831 N.W.2d 805 (the court of appeals is a "court of review," not a fact-finding court). Accordingly, I conclude that the circuit court violated the *D.J.W.* directive by failing to make specific findings of evidentiary fact.

## II. Remedy

¶23    J.D.C. seeks reversal based on the ***D.J.W.*** violation.  The County does not make any argument that a ***D.J.W.*** violation should not result in reversal; instead, the County argues solely that there was no ***D.J.W.*** violation.  The County also does not argue that remand proceedings—rather than outright reversal— would be appropriate.[8]

¶24    In the absence of any argument from the County that J.D.C. is not entitled to outright reversal for the circuit court's ***D.J.W.*** violation, and given the important objectives served by the ***D.J.W.*** directive as explained by our supreme court, I conclude that outright reversal of the involuntary commitment order is the appropriate remedy.  Because I reverse the involuntary commitment order upon which J.D.C.'s involuntary medication order is based, I therefore also reverse the involuntary medication order.[9]

---

[8] In any event, it appears that the circuit court would lack competency to conduct remand proceedings.  Although the challenged recommitment order has not yet expired, our supreme court recently explained in ***Walworth County v. M.R.M.***, 2023 WI 59, 408 Wis. 2d 316, 992 N.W.2d 809, that a "circuit court may issue an extension order only before the preceding commitment order expires," and after expiration of that preceding commitment order, the circuit court lacks competency to conduct remand proceedings.  ***Id.***, ¶27.  Here, the preceding commitment order expired on September 19, 2022; therefore, it appears that under ***M.R.M.***, the court lacks competency to conduct remand proceedings.  However, because the parties have made no arguments as to the court's competency to conduct remand proceedings, I do not reach this issue and address it no further.

[9] An order for involuntary medication and treatment requires the existence of a valid commitment order.  *See* WIS. STAT. § 51.61(1)(g)3.  Thus, reversal of J.D.C.'s recommitment order also requires reversal of the associated involuntary medication order.

## CONCLUSION

¶25 For the foregoing reasons, the orders of the circuit court extending J.D.C.'s commitment and making him subject to involuntary medication and treatment are reversed.

*By the Court.*—Orders reversed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.